# IN THE UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| A.L.L. CONSTRUCTION, LLC, ) <br> ) <br> Plaintiff, ) <br> ) <br> v.  ) <br> ) <br> THE METROPOLITAN ST. LOUIS ) <br> SEWER DISTRICT, ) <br> ) <br> ) <br> JAMES FAUL, RUBY BONNER, ) <br> REV. RONALD BOBO, MICHAEL ) <br> YATES, and JAMES I. SINGER, in their ) <br> individual capacities as members of the ) <br> Board of Trustees of the ) <br> Metropolitan St. Louis Sewer District, ) <br> ) <br> and ) <br> ) <br> BATES UTILITY CO., INC., ) <br> ) <br> Serve:   Thomas Bates ) <br>         841 Westwood Ind. Park Dr. ) <br>         Weldon Spring MO 63304 ) <br>         Defendants. ) | Case No. 4:17-CV-02367-AGF <br><br><br><br><br><br> **<u>JURY TRIAL DEMANDED</u>** |

## FIRST AMENDED COMPLAINT

COMES NOW A.L.L. Construction, LLC, by and through the undersigned, and brings this cause of action pursuant to 42 U.S.C. § 1983 against The Metropolitan St. Louis Sewer District and individual members of the Board of Trustees of the Metropolitan St. Louis Sewer District in their individual capacities only, and pursuant to 42 U.S.C. § 1981 against Bates Utility Co., Inc., The Metropolitan St. Louis Sewer District, and individual members of the Board of Trustees of the Metropolitan St. Louis Sewer District in their individual capacities only and in support thereof, states to the Court the following:

EXHIBIT M

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff A.L.L. Construction, LLC (hereinafter, "ALL"), is a Missouri limited liability company in good standing, with its principal place of business in the City of St. Louis, Missouri.

2. Defendant The Metropolitan St. Louis Sewer District (hereinafter, "MSD"), is a municipal corporation and political subdivision of the State of Missouri, organized and existing pursuant to powers conferred by Article VI, Section 30 of the Missouri Constitution. By reason of Section 1.010 of the MSD Charter, it can sue and be sued. Its headquarters are situated in the City of St. Louis, Missouri.

3. Defendants James Faul, Ruby Bonner, Rev. Ronald Bobo, Michael Yates, and James I. Singer are, or were at all times relevant hereto, five of the six members of MSD's Board of Trustees[1] (hereinafter, collectively, the "Trustees"). They are sued in their individual capacities only. They are residents of either the City of St. Louis, Missouri, or of St. Louis County, Missouri.

4. Defendant Bates Utility Co., Inc. (hereinafter, "Bates"), is a Missouri general business for-profit corporation, with its principal place of business in the County of St. Charles, Missouri.

5. This civil action arises under the Constitution and laws of the United States, and accordingly this Court has jurisdiction over the subject matter. 28 U.S.C. § 1331.

6. This Court may exercise jurisdiction over each of the persons of Defendants for the reasons that they are residents and/or have their principal places of business within Missouri, and specifically within the territorial boundaries of the U.S. District Court for the Eastern District of

---

[1] The sixth member of the Board of Trustees, Annette Mandel, is not named as a defendant in this action for the reason that she is the sole member of the Board who did not participate in the unlawful and unconstitutional discriminatory conduct as set forth herein.

Missouri, and all of the unlawful and unconstitutional conduct as complained of herein occurred in the City of St. Louis, Missouri.

7. Venue is proper in the Eastern Division of this Court for the reasons that all defendants reside and/or have their principal places of business in this division and because this is the division in which the claim for relief arose. Local Rule 3.2-07(B)(2).

## FACTS COMMON TO ALL COUNTS

8. ALL is in the infrastructure business, and, among other things, constructs and aids in the construction of sewer lines, tunnels, and systems, and in this line of work has worked on a number of projects for MSD throughout the years.

9. MSD advertises to the public that it values racial diversity and inclusiveness. For instance, it states on its website that as it "embarks upon historically significant public works projects within it's [sic] service area, the District intends to fully support efforts for inclusion and utilization of Minority and Women Business Enterprises. To further enhance our concerted and coordinated efforts to promote Diversity, MSD has developed a comprehensive Workforce Program to support the inclusion of minority and women workers on MSD projects to drive economic growth in the Metropolitan St. Louis Region. MSD has done an exceptional job with internally focused diversity efforts. In promoting efforts of collaboration to provide the necessary components to ensure level playing fields, MSD is committed to strategies which focus on the stimulation of economic growth in our communities, while increasing the vitality of under-utilized minorities and women in the St. Louis community."

10. Pursuant to MSD policy, a bidder on non-building construction projects exceeding $50,000.00 must utilize Minority Business Enterprises (hereinafter, "MBE") for at least 17% of the project. A bidder who fails to achieve this percentage of MBE participation will have its bid

rejected as nonresponsive, unless the bidder can demonstrate a good faith effort to achieve the MBE goal.

11. Upon information and belief, this number was established based on a Disparity Study completed by MSD in December 2012 that found statistically significant underutilization of African-American businesses in both building and non-building construction subcontracts.

12. ALL is an MBE under MSD policy, in that its owner, Anton Lumpkins (hereinafter "Lumpkins') is African-American.

13. ALL has worked with MSD on various infrastructure projects both as the general contractor on smaller projects and as an MBE subcontractor on large projects for almost twenty years.

14. ALL has successfully served MSD as both a general contractor and subcontractor throughout the years.

15. ALL was awarded MSD's "Minority Contractor of the Year" in 2000.

16. ALL's business relationship with Bates began in October 2015. ALL worked with Bates on several infrastructure projects for MSD.

17. Many of the principals of ALL and Bates got their starts in the infrastructure construction business together at Affholder Tunneling and Insituform Technologies.

18. In the first half of 2016, Bates included ALL as a subcontractor on several projects MSD awarded it.

19. Bates' interest in including ALL as a true partner quickly evaporated, and its inclusiveness began to devolve into a sham, intended only to satisfy MSD's minority participation requirements on paper.

20. In 2016, a Chief Estimator and Project Manager with Bates began to express his distaste for MSD's diversity initiatives, including minority participation requirements.

21. Over time, despite its contracts with both MSD and ALL, Bates began shutting ALL out of the actual work on the projects it had been awarded, meaning that Bates was not meeting its stated MBE goals after projects were awarded to it. Upon information and belief this work was actually performed by Bates and/or other nonminority companies who were paid for the work that was supposed to go to ALL as an MBE.

22. By way of example, in March 2016, while working on the Midland Sanitary Relief project, Corey Bates, a Bates project superintendent ordered ALL from the worksite, preventing it from doing work on the project.

23. By way of another example, on the Caulks Creek project, Bates as general contractor submitted documents to MSD indicating that it had completed 92% of the total work on the project. In its initial bid, and in order to meet its diversity requirements, Bates stated to MSD that ALL would provide 10% of the total work on this project. At the time of Bates' submittal to MSD, however, Bates had permitted ALL to perform only 1% of the total value of the work on the project, meaning that it would be impossible for ALL to perform the full amount of work Bates had represented to both MSD and ALL that ALL would perform.

24. In other projects for which Bates had won the bid from MSD because it listed ALL as an MBE, allowing Bates to meet MSD's MBE participation goals, Bates did not even bother with the pretense of calling ALL to the job site.

25. These projects included, but were not necessarily limited to, the Ladue-141 Crossing, Roxbury, Gravois Creek, Lynkirk, and Gingras Creek.

26. On these projects, ALL had contractual rights and a contractual relationship with Bates to perform work and receive monetary compensation in exchange for such work.

27. In other words, beginning in early 2016, Bates used ALL on bids to meet MSD's MBE participation requirements so that it would be awarded MSD projects but did not actually use ALL on these projects. Upon information and belief Bates, a white-owned company, was either pocketing the money it represented to MSD it had earmarked for its MBE subcontractors, including ALL or used other white-owned companies to perform this work, defeating the very purpose of MSD's diversity initiatives.

28. Bates wanted to use ALL as a "pass-through" minority subcontractor, obtaining projects using MBE subcontractors, but doing the work and keeping a majority of the money itself or passing it on to another non-minority-owned business.

29. ALL refused to be Bates' "pass-through," and instead demanded to perform the work, obtain the experience, and receive all the benefits pursuant to the contracts Bates had with MSD.

30. ALL attempted to work with Bates to put an end to practices designed to circumvent MSD's MBE participation requirements. These efforts were unsuccessful.

31. ALL then contacted MSD staff in an effort to obtain Bates' compliance with MSD's MBE participation requirements on MSD projects.

32. ALL believed that it was not the only MBE contractor that was being exploited on MSD projects and that other MBEs were being listed on bids to meet MSD's MBE participation requirements and then not being used on the projects, making these requirements a sham.

33. MSD's diversity team and ALL attempted to schedule meetings with Bates to resolve these problems, but Bates refused to address the issues.

34. On or about April 14, 2016, Lumpkins, as a private citizen and owner of ALL, spoke at a public meeting of MSD's Board of Trustees in the hopes of ending Bates' discriminatory interference with its contractual rights and relationships.

35. Lumpkins told the Board about the issues that he and other minority subcontractors like ALL were having with Bates. Specifically, Lumpkins informed the Trustees that Bates was using ALL and other MBEs to achieve MSD's diversity requirements, while excluding them from performing the work on projects.

36. During the course of this meeting, Brian Hoelscher, the Executive Director of MSD, admitted that Bates' problems with the minority participation program were not about "just Anton [Lumpkins]," but rather "it's others. It's other projects."

37. During this same meeting, one of MSD's Trustees, James Singer, noted that Lumpkins was "like a whistleblower" given the "pretty serious" allegations regarding Bates' circumvention of MSD's MBE participation requirements.

38. After Lumpkins blew the whistle on Bates' noncompliance with MSD's MBE participation requirements, the Board did not approve the award of a project to Bates.

39. MSD ultimately suspended Bates from bidding on any projects as a general contractor for one year because of its actions designed to circumvent MSD's MBE participation requirements.

40. However, MSD permitted Bates to continue to work on and even to present change orders on MSD projects listing ALL as a MBE on the projects so it could meet its MBE requirements, knowing ALL was doing no work on these projects, and therefore, Bates was not meeting its MBE requirements.

41. Additionally, the Monday following the April 14, 2016 Board meeting, MSD staff began contacting ALL complaining about various issues with ALL's work, which were nothing but pretext.

42. When ALL demanded proof of alleged deficiencies in its work, MSD refused to provide any evidence of same.

43. On June 9, 2016, Lumpkins again went to the Trustees to blow the whistle regarding Bates and MSD's staff's retaliation, including informing the Trustees of the retaliation ALL had experienced for his complaints against Bates. Lumpkins notified the Trustees that MSD staff had begun citing ALL for deficient work while refusing to provide any evidence.

44. The Trustees took no action in response to Lumpkins's complaints on behalf of Plaintiff.

45. Instead, on or about June 19, 2016, after Lumpkins blew the whistle on Bates' failure and refusal to comply with MSD's MBE participation requirements, ALL was removed from the Small Contractor Program.

46. The Trustees were notified and/or consulted regarding MSD staff's intention to remove ALL from the Small Contractor Program, and tacitly approved, consented to, and/or ratified the retaliatory removal of ALL from the Small Contractor Program.

47. Despite Bates excluding ALL from its work sites, and despite MSD and its Trustees' knowledge that Bates was engaging in this practice, Bates continued to include ALL on change orders submitted to MSD and/or its Board of Trustees for approval to meet MBE requirements.

48. Trustees were aware that Bates continued to use ALL as an MBE contractor on its bid forms and change-order forms submitted to MSD, even though ALL was not performing the

actual work, and nonetheless continued to approve such bids and change-orders, effectively turning a blind eye to Bates' discrimination against ALL, despite MSD's minority participation requirements.

49. As a result, MSD, by and through the Trustees, condoned and participated in Bates' discriminatory exclusion of ALL from its contracts by consenting to and/or ratifying these discriminatory actions.

50. Additionally, MSD and The Board retaliated against ALL during the bid and award process for the Deer Creek Sanitary Tunnel (Clayton Rd to RDP) (11731-015.1) Contract Number 20437 (hereinafter, the "Deer Creek Project").

51. Bids of the would-be general contractors for the Deer Creek Project were submitted on or about September 1, 2016.

52. MSD's professional staff determined that the lowest and best bid was submitted by an out-of-town joint venture of Jay Dee and Frontier-Kemper (hereinafter, "Jay Dee"), whose bid was $145,300,000.00.

53. MSD's professional staff awarded the Deer Creek Project to Jay Dee in a letter dated September 29, 2016, which was posted online on October 6, 2016.

54. Jay Dee included ALL as a subcontractor in its bid. ALL was to perform $5,000,000.00 worth of tunnel and shaft excavation and support and concrete forming work.

55. ALL's participation as a subcontractor on the project, together with other MBE subcontractors, allowed Jay Dee to meet the MBE participation requirements on the Deer Creek Project.

56. Although MSD's professional staff determined that the Jay Dee bid that included ALL was the lowest and best bid, the Trustees had to formally ratify that award.

57. After MSD's professional staff determined the Jay Dee bid that included ALL as a subcontractor was the lowest and best bid, but before the Trustees brought up the bid for ratification, a competitor of Jay Dee, SAK Construction (hereinafter, "SAK")[2], lobbied MSD's professional staff to reconsider its award to Jay Dee because of its inclusion of ALL as a subcontractor.

58. On two separate occasions, MSD's professional staff formally defended in writing the appropriateness of ALL's inclusion in Jay Dee's bid, including by MSD's chief executive officer, Brian Hoelscher, a licensed professional engineer.

59. MSD's professional staff stated that ALL was "designated to perform a commercially useful function," and that Jay Dee accordingly "was the lowest responsible and responsive bidder and the award in its favor should stand."

60. Thereafter, Jay Dee's Notice of Award should have been ratified by MSD's Board of Trustees as a matter of course, relying upon the conclusions of its professional staff, who were more qualified to determine ALL's capabilities than the political appointees to the Board, consisting of four lawyers, a religious minister, and a business representative for a local union.

61. Upon information and belief, the MSD Board of Trustees has rarely—if ever—refused to ratify a notice of award to a contractor recommended by its professional staff of engineers, project managers, and construction finance experts.

62. In fact, in the last five years, MSD's Board of Trustees has ratified every single notice of award given by MSD's professional staff for projects in excess of $10,000,000.00—with the lone exception of Jay Dee and the Deer Creek Project.

---

[2] SAK is not a party to this suit.

63. On December 8, 2016, after ALL had engaged in whistleblower activity, as recognized by one of MSD's own trustees, the Trustees voted against introducing the ordinance that would have approved MSD's professional staff's award of the bid to Jay Dee.

64. Trustees swore in affidavits that the reason they voted against MSD staff's recommendation to approve Jay Dee was because of its inclusion of ALL as a subcontractor.

65. Defendant Singer even stated that he objected to ALL because of the Bates matter.

66. After vigorously defending ALL, MSD professional staff wrote just weeks later to Jay Dee informing it of staff's "objection to the utilization of A.L.L. Construction as a subcontractor for the" Deer Creek Project, in correspondence dated December 9, 2016. The letter further stated that MSD was requesting that Jay Dee submit "an acceptable MBE substitute(s) to A.L.L. Construction."

67. Upon information and belief, MSD's professional staff's sudden and complete reversal of its position as to ALL came at the direction and instruction of the Trustees.

68. MSD's request that Jay Dee remove ALL from the Deer Creek Project was, according to Brian Hoelscher, the "first time in [MSD's] staff's recollection" that it had ever specifically requested the removal of a single subcontractor.

69. MSD's Board of Trustees provided no reason to Jay Dee for removing ALL from the project after its own professional staff concluded that there was no reason to do so.

70. MSD even refused to provide a reason to ALL, rejecting its request for a meeting, writing on December 23, 2016: "this Project remains an active procurement and therefore staff is unable to discuss the matter with any outside entity or interested party."

71. The Trustees had no legitimate, nondiscriminatory and/or non-retaliatory basis to suddenly and without explanation cause MSD to remove ALL from the Deer Creek Project,

particularly when its professional staff had determined that ALL was qualified to do the work for which it had been selected as a subcontractor and/or that ALL had been designated to perform a commercially useful function.

72. As set forth above, Trustees stated in sworn affidavits that they voted against awarding Jay Dee the Deer Creek Project for the sole reason that it had included ALL as part of its bid and Trustees specifically stated they opposed ALL's participation in the project because it objected to allowing Bates to use it to meet minority requirements while not actually using ALL as a minority contractor on projects.

73. Jay Dee never had a chance to be awarded the Deer Creek Project once it included ALL as a subcontractor.

74. The fact that Jay Dee included ALL in its bid for the Deer Creek Project is the sole and exclusive reason the Trustees refused to award the Deer Creek Project to Jay Dee.

75. Defendants Faul and Bobo voted to approve Jay Dee's bid once Jay Dee removed ALL, after explicitly rejecting the bid for the sole reason that Jay Dee had included ALL as a subcontractor, demonstrating that their only objection to Jay Dee was its inclusion of ALL as a subcontractor.

76. Defendant Singer stated in a sworn affidavit that he refused to "permit" Jay Dee to change its bid since its original bid including ALL was "not acceptable," meaning that his refusal to award the contract to Jay Dee was based solely on its inclusion of ALL in its original bid.

77. Defendant Bonner similarly adopted a strained interpretation of MSD rules regarding bidding—an interpretation she admitted conflicted with MSD staff's own interpretation—that allegedly prevented her from approving Jay Dee's bid even though Jay Dee

attempted to replace ALL. Defendant Bonner's opposition to Jay Dee, therefore, was predicated solely upon its original inclusion of ALL.

78. Defendant Michael Yates stated in his sworn affidavit that he refused to vote to approve Jay Dee even though it had replaced ALL as a subcontractor because its previous selection of ALL left him with "some doubt" that it could "perform the work."

79. Trustees have admitted that Jay Dee's original choice to include ALL as a subcontractor in its bid for the Deer Creek Project forever precluded its approval by the Trustees.

80. If Jay Dee's original bid had been identical in every respect but had included a different subcontractor other than ALL, Jay Dee would have been awarded the Deer Creek Project by the Trustees.

81. This would not be the first time that MSD's Board of Trustees has engaged in questionable conduct as it relates to the use of the public's money. By way of example, in 2003, five of the six Board members were asked to resign after complaints were made (dating back to 1999) about the cost of the Skinker-McCausland tunnel project and conduct that undermined the public's confidence in the Board. Upon information and belief, the contractor on that project was Affholder Tunneling. Affholder is the "A" in SAK. The "S" and "K" of SAK, Jerry Shaw and Tom Kalishman, also worked for Affholder.

### COUNT I – ACTION PURSUANT TO 42 U.S.C. § 1983
(AGAINST TRUSTEES AND MSD)

82. The Trustees are the final policymaking authority of MSD.

83. The Trustees caused ALL to be removed as a subcontractor from the Deer Creek Project, and then caused the denial of the Deer Creek tunnel project to Jay Dee solely because of ALL's—a whistleblower—participation in it resulting in financial injury to ALL.

84. The Trustees ratified, approved, and/or condoned ALL's removal from MSD's Small Contractor Program, also resulting in financial injury to ALL.

85. Lumpkins' speech, and more specifically, his expressions as a private citizen to the Board of Trustees that Bates was not complying with MSD's MBE participation requirements on its projects (and potentially engaging in fraud as it relates to such participation) designed to ameliorate the legacy of race discrimination in the St. Louis-area construction community, made at a reasonable time and in a reasonable manner, was a motivating factor and/or played a part in the decisions to retaliate against ALL by among other things, removing it from the Deer Creek Project and the Small Contractor Program.

86. There was a direct and causal connection between Lumpkins' First Amendment-protected speech on behalf of Plaintiff and the retaliatory conduct directed against ALL as alleged herein.

87. Lumpkins' speech on behalf of Plaintiff about pretextual and possibly fraudulent minority participation in MSD projects constituted speech regarding a matter of public concern.

88. Lumpkins' constitutionally-protected interest in free speech regarding a matter of public concern outweighs any interests these Defendants might have in preventing such speech, particularly when the Board's actions will have a chilling effect on other minority contractors speaking up when MSD's minority participation requirements are ignored or circumvented, once again making minority partners in public works projects nothing but a sham in the St. Louis region, as minority contractors have complained about for years.

89. Lumpkins' protected speech made at a reasonable time and in a reasonable manner did not render MSD's operations inefficient, and his speech did not disrupt MSD operations in any way.

90. The actions taken against ALL by the Defendants qualify as adverse governmental actions authorized and approved by these Defendants acting under color of state law.

91. The actions of the Defendants taken under color of state law violated ALL's rights secured by the Constitution of the United States, specifically the First Amendment to the United States Constitution made applicable to the states by the Fourteenth Amendment.

92. As a direct and proximate result of the actions of the Defendants taken against ALL in retaliation for Lumpkins exercising his First Amendment right to free speech, ALL has sustained damages that include but are not necessarily limited to, lost profits.

93. As a direct and proximate result of the actions of the Defendants taken against ALL in retaliation for Lumpkins exercising his First Amendment right to free speech, ALL has also suffered injury and damage to its professional reputation.

94. As a result of the Trustees' unconstitutional retaliation against it as set forth herein, Plaintiff has lost the majority of its business due to loss of professional reputation and an unwillingness on the part of contractors to be associated with an entity that has drawn the wrath of MSD's Trustees.

95. The conduct of the individual Defendants in their individual capacities as set forth herein was wanton, willful, and showed a reckless indifference to ALL's constitutional rights as set forth above, making an award of punitive damages proper to deter these and other similarly situated defendants from like conduct in the future.

**WHEREFORE**, Plaintiff prays this Court grant judgment in its favor and against Defendants Metropolitan St. Louis Sewer District and the Trustees, award it damages so as to fully and justly compensate it for its lost profits, damage to professional reputation and other damages, award it punitive and exemplary damages so as to punish the individual Defendants in their

individual capacities and deter them and others similarly situated from engaging in such wrongful conduct in the future, for its costs, attorneys' fees, and pre and post-judgment interest as provided by law, and for such other and further relief as this Court deems just and proper.

### COUNT II – ACTION UNDER 42 U.S.C. § 1981
(AGAINST ALL DEFENDANTS)

96. Plaintiff re-alleges the allegations of all preceding paragraphs, and incorporates them by this reference as if fully set forth herein.

97. Plaintiff is a member of a protected class, in that its sole member, owner, and president is African-American.

98. The Trustees are the final policy-making authority of MSD.

99. Plaintiff had valid, pre-existing contractual relationships with Bates as an MSD subcontractor on numerous projects for MSD.

100. Defendant Bates interfered with such contracts by forcing ALL from job sites, not paying it in full for services rendered, and by continuing to use its name as an MBE on change orders submitted to MSD for the purpose of obtaining contracts, to include change orders, consistent with MSD's minority participation requirements, while excluding ALL from the benefits of the contractual relationship.

101. The Trustees, and MSD by and through its Trustees, interfered with ALL's contractual relationships, including by interfering with and denying to Plaintiff the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationships, by ratifying, condoning, and approving Bates' conduct, of excluding ALL from working on Bates contracts/change orders for which it was listed as a MBE.

102. Defendants had a racially-discriminatory intent in interfering with such contractual relationships, and in denying to Plaintiff the enjoyment of the benefits, privileges, terms, and conditions of the contractual relationships.

103. This discrimination concerned the making and enforcing of contracts within the meaning of §1981 because involving the performance, modification de facto terminations of such contracts and/or prevented ALL from enjoying the benefits, privileges, terms and conditions of these contractual relationships.

104. Bates' agents explicitly stated its hostility towards programs designed to benefit African-Americans and other racial minorities.

105. Plaintiff's status as a minority owned business was a motivating factor in Defendants interference with Plaintiff's contractual relationships and/or in ratifying/condoning such conduct.

106. Defendants' interference with Plaintiff's contractual relationships as set forth herein caused Plaintiff damages in the form of lost profits, future business, and diminution in professional reputation.

107. Defendants' interference with Plaintiff's contractual relationships as set forth herein was willful, wanton, motivated by evil motive or intent, and/or involved a reckless or callous indifference to Plaintiff's rights as guaranteed by the Constitution and laws of the United States, making an award of punitive damages proper to deter these and other similarly situated defendants from like conduct in the future.

**WHEREFORE**, Plaintiff prays this Court grant judgment in its favor and against Defendants Metropolitan St. Louis Sewer District, its Trustees, and Bates, award it damages so as to fully and justly compensate it for its lost profits, damage to professional reputation and other

damages, award it punitive and exemplary damages so as to punish the individual Defendants in their individual capacities and deter them and others similarly situated from engaging in such wrongful conduct in the future, for its costs, attorneys' fees, and pre and post judgment interest as provided by law, and for such other and further relief as this Court deems just and proper.

Respectfully submitted,

**PLEBAN & PETRUSKA LAW, LLC**

by:    /s/ Lynette M. Petruska
Lynette M. Petruska, #MO41212
lpetruska@plebanlaw.com
J.C. Pleban, #MO63166
JC@plebanlaw.com
Steven R. Kratky, #MO61442
skratky@plebanlaw.com
2010 S. Big Bend Blvd
St. Louis, MO 63117
Telephone: 314-645-6666
Facsimile: 314-645-7376

*Attorneys for the Plaintiff*

**CERTIFICATE OF SERVICE**

The undersigned certifies that this document was filed through the electronic filing system and will be sent electronically to all counsel of record this 11th day of January, 2018.

/s/ Lynette M. Petruska